UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA J. MORRISON,

                                      No. 13-12561

               Plaintiff,             District Judge John Corbett O'Meara

v.                                 Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Linda J. Morrison ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that the case be remanded under the sixth sentence of 42 U.S.C. 405(g) for further consistent with Section V-C. of the analysis, with this Court retaining jurisdiction[1]

---

[1]Under 42 U.S.C. § 405(g), a "sentence six" remand (in which the district court retains jurisdiction) "does not attach to any substantive ruling but merely remands the matter for further review in light of newly discovered evidence which is to be considered by the administrative law judge and therefore does not constitute a 'judgment' from which appeal can be taken." *Melkonyan v. Sullivan,* 501 U.S. 89, 97–99, 111 S.Ct. 2157,

-1-

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB on August 9, 2010, alleging disability as of November 1, 2007[2] (Tr. 159-160).  On September 22, 2011 Administrative Law Judge ("ALJ") Jessica Inouye conducted an administrative hearing, held in Mount Pleasant, Michigan (Tr. 34).  Plaintiff, represented by attorney John Wildeboer, testified, (Tr. 39-82), as did vocational expert ("VE") Dr. Donald Hecker (Tr. 82-87).  On December 2, 2011, ALJ Inouye found Plaintiff not disabled (Tr. 29).

On April 19, 2013, the Appeals Council declined to review the administrative decision (Tr. 1-5).  Plaintiff filed suit in this Court on June 12, 2013.

## II.  BACKGROUND FACTS

Plaintiff, born December 15, 1962, was just short of her 49th birthday at the time of

---

2163, 115 L.Ed.2d 78 (1991). The reviewing court does not grant summary judgment, but merely remands for further review. *Id.* The court "may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. § 405(g)." *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993). However, the court retains jurisdiction in a Sentence Six remand, and enters final judgment only "after post-remand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer,* 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993); see also *Melkonyan,* 501 U.S. at 98.

[2]The administrative opinion states that Plaintiff applied for Supplemental Security Income ("SSI") not DIB (Tr. 19).  Plaintiff's counsel also refers to the claim as an "SSI" claim (Tr. 257).   Entitlement to DIB under Title II of the Social Security Act is based on disability and a claimant's earning record.  To establish a claim for SSI benefits under Title XVI, a claimant must establish disability and financial need. *Willis v. Sullivan*, 931 F.2d 390, 392, fn. 1 (6th Cir.1991); 42 U.S.C. § 1382.

the administrative decision (Tr. 29, 159). She completed a GED in 1989 and worked previously as a baker, cook, dishwasher, cashier, and office manager (Tr. 178-179). She alleges disability due to bipolar disorder, personality disorder, post-traumatic stress disorder ("PTSD"), low back pain, arthritis of the left knee, and Attention Deficit Hyperactivity Disorder ("ADHD") (Tr. 177).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived in a second-floor apartment with her 16-year-old son (Tr. 39). She had not worked since December 5, 2010 when the restaurant where she worked was destroyed in a fire (Tr. 40). Even if the fire had not occurred, her physical conditions would have prevented her from continuing work (Tr. 40).

Her job at the restaurant entailed cooking and washing dishes (Tr. 40). She worked two days a week for two to three hours (Tr. 40). Due to body pain, she had not looked for work since December, 2010 (Tr. 41). She had not contacted job placement services because she was unable to perform any work (Tr. 41). She was unable to clean her apartment (Tr. 41). In addition to obtaining a GED, she had taken computer training (Tr. 42). She did not experience problems reading, writing, or calculating (Tr. 42). She seldom drove (Tr. 42). She was 5'3-3/4" and weighed 150 pounds (Tr. 42). Her medications caused weight gain (Tr. 42). She was right-handed (Tr. 42).

Plaintiff had medical insurance and received food stamps (Tr. 43). She was disabled

-3-

as a result of herniated lumbar discs and arthritis of the knees, elbows, shoulders, and joints (Tr. 43). She experienced bilateral hand swelling (Tr. 44). She experienced hearing problems since her ear drum was shattered during a sexual assault (Tr. 44). She did not use any hearing device but had been advised to use hearing aids (Tr. 44-45).

Plaintiff experienced constant low back pain (Tr. 45). She obtained relief by wearing a back brace day and night (Tr. 45). She coped with nausea as a result of pain medication by smoking marijuana (Tr. 46). She also addressed back pain with a combination of pain medicine, marijuana, and a topical lotion (Tr. 46). Her physician had approved her use of marijuana (Tr. 47). Back pain caused difficulty moving from a reclining to upright position (Tr. 48). She was able to garden in a sitting position only (Tr. 49). The past summer, she planted tomatoes, green beans, and peas (Tr. 50). Her boyfriend planted squash (Tr. 50).

Plaintiff was unable to lift more than 15 pounds (Tr. 50). Her right shoulder popped "completely out of [the] socket" on a "constant" basis (Tr. 51). She had been advised to undergo surgery for the condition, but was "scared to death" of surgery (Tr. 51). She experienced shortness of breath when lifting more than 15 pounds (Tr. 52). For arthritis of the knees, she took aspirin, applied Aspercreme, and used an ace bandage (Tr. 53). The knee condition prevented her from walking for extended distances (Tr. 53). She experienced difficulty descending and climbing stairs (Tr. 54). She also experienced Chronic Obstructive Pulmonary Disease ("COPD") but admitted that she continued to smoke (Tr. 54).

Plaintiff was able to grocery shop by leaning on the cart for support (Tr. 55). She was

-4-

unable to walk for more than one city block before requiring a rest (Tr. 55). She experienced a limited range of hand motion and took arthritis medication twice daily (Tr. 56). As a result of hand limitations, she experienced problems gripping objects and was no longer able to crochet (Tr. 56).

Plaintiff described symptoms of bipolar disorder as "flipping a switch on and off" (Tr. 58). She experienced violent impulses while in a manic state, but acknowledged that her condition had improved with medication and therapy (Tr. 58). Despite the improvement in her condition, she was "nuts" as a result of mood swings (Tr. 61). Her medications caused the side effect of fatigue (Tr. 59). She was unable to stand for more than 15 minutes (Tr. 59). She was unable to sit for more than one hour in an orthopedic chair or sit for more than 20 minutes in any other chair (Tr. 60). She consumed between two and six drinks at a sitting "two or three" times a week (Tr. 61). Neither the alcohol consumption nor her use of marijuana affected her ability to work (Tr. 61-63).

 Her ability to walk for long distances was limited as a result of breathing problems caused by COPD (Tr. 63). She collected empty boxes and donated them to a church so they could be used to package food for delivery to needy families (Tr. 64). She currently took care of two small dogs and 10 birds (Tr. 64). The birds lived in "a big aviary cage" built by her boyfriend (Tr. 64). A health care aide appointed by the state to perform housekeeping chores cleaned up after the birds once a week (Tr. 64-65). Plaintiff enjoyed playing computer games for up to an hour at a time (Tr. 65). She watched television for at least two

hours a day (Tr. 66).

Plaintiff used the back brace and ace bandage for the knee while working at the restaurant (Tr. 66). She had recently been prescribed a CPAP machine to help her nighttime breathing, but did not like using the device (Tr. 68). On a typical day, she arose between six and nine o'clock, soaked some dishes, performed personal care activities, and eventually washed the dishes (Tr. 68). She showered with the use of handrails (Tr. 70). She did not dust, take out the trash, or empty laundry baskets (Tr. 69). She grocery shopped with the help of her mother, son, boyfriend, or care giver (Tr. 69). She took two to three-hour naps during the day (Tr. 69-70). She had a good friend living in the same complex who visited often (Tr. 70).

Plaintiff experienced depression continually (Tr. 71). Due to depression, she was unable to get out of bed approximately five days a month (Tr. 72). She experienced daily crying jags (Tr. 72). She required the use of the health aide for dusting, vacuuming, and companionship (Tr. 73). She was unable to dust due to respiratory problems (Tr. 73). She was unable to vacuum due to back pain (Tr. 73). Her frequent irritability affected relationships with her friends and family (Tr. 75). Her mood swings were not as pronounced when she was on medication (Tr. 75). She had been drinking more heavily lately due to loneliness and depression (Tr. 77). Plaintiff had won a sexual harassment trial against a former boss (Tr. 77).

-6-

**B. Medical Records**[3]

**1. Treating Records**[4]

December, 2005 x-rays of the left ankle and foot were negative for fracture or arthritis (Tr. 382-383). Plaintiff reported depression in January, 2006 (Tr. 342). In March, 2006, she was prescribed Effexor for depression and anxiety (Tr. 344). The following month, she reported good results from Effexor (Tr. 345). September, 2006 records state that Plaintiff filed a police report after being physically abused (Tr. 348). The following month an esophagogastroduodenoscopy was negative for ulcers (Tr. 400). May, 2007 records state that she experienced back tenderness (Tr. 351).

January, 2008 notes indicate that Plaintiff exhibited a normal affect (Tr. 354). A cardiac stress test and chest x-ray performed the same month were unremarkable (Tr. 378). March, 2008 notes state that she was taking Vicodin following an ankle fracture (Tr. 355). A chest x-ray was unremarkable (Tr. 394). May, 2008 treating notes state that Plaintiff was recovering "nicely" from March, 2008 surgery for the ankle fracture (Tr. 387-388, 391, 395-396). November, 2008 record indicate that she was wheezing due to COPD (Tr. 356). She exhibited full muscle strength and a stable gait (Tr. 356). Notes from the following month state a diagnosis of "bipolar/depression" (Tr. 357). Notes from later the same month noted

---

[3]

Records unrelated to the benefits claim have been reviewed in full but are omitted from the current discussion.

[4]Records pertaining to Plaintiff's treating prior to the alleged onset date of November 1, 2007 are included for background purposes only (Tr. 335).

slight improvements in mood and sleep (Tr. 358).   In August, 2009, Plaintiff reported hot flashes (Tr. 415).

In May, 2010, psychiatrist Dr. Anne Tadeo, M.D. performed an initial evaluation, noting Plaintiff's report of multiple past sexual assaults and a successful civil suit against a former employer who sexually assaulted her (Tr. 295-296).   She was previously addicted to crack cocaine (Tr. 296).   She stated that she was able to budget her money and pay all of the household expenses (Tr. 297).   She owned a vehicle, had a current driver's license and was able to provide her own transportation (Tr. 297).   She had convictions for attempting to bring contraband into a prison, possession of crack cocaine, and impaired driving (Tr. 298).   She stated that she was able to complete all household tasks (Tr. 299).   She reported an attempted suicide in 2002 (Tr. 300).

Dr. Tadeo noted that Plaintiff was fully oriented with a "depressed, angry, and anxious" mood (Tr. 300-301).   Dr. Tadeo remarked that Plaintiff admitted to daily alcohol consumption and was "in pre-engagement phase with her alcohol abuse" (Tr. 300, 316).   Dr. Tadeo diagnosed Plaintiff with bipolar disorder and PTSD, assigning her a GAF of 40[5] (Tr. 301).

June, 2010 therapy records by Barbara Goss, L.M.S.W., note Plaintiff's complaints of menopause-related mood swings, and angry outbursts (Tr. 217).   Plaintiff reported that

---

[5]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM-IV-TR* at 34.

neither Vistaril nor Eleval prescribed by her family doctor improved the psychological symptoms (Tr. 317). Goss noted that Plaintiff was "very motivated for change" (Tr. 319). Goss recommended group and individual therapy (Tr. 320). The following month, Dr. Tadeo prescribed Prozac and Trileptal (in addition to Vistaril) for psychological symptoms (Tr. 326). The same month, Plaintiff sought treatment for a sprained ankle and first and second degree burns to the arm (Tr. 331-332). Charles Kerr, D.O. completed a Certificate of Medical Necessity (Tr. 332). Treating notes state that the burned area was "healing well" (Tr. 333). Plaintiff was advised by Bayside Health Center treating staff to use a nicotine patch to reduce tobacco use (Tr. 365). Plaintiff noted that her job required her to lift up to 20 pounds (Tr. 413). She noted good results from Darvocet (Tr. 413). Dr. Tadeo's July, 2010 treating notes state that Plaintiff exhibited poor focus, but denied suicidal or homicidal ideation (Tr. 504).

August, 2010 treating records note Plaintiff's complaint of lower back pain with radiculopathy (Tr. 411). Imaging studies of the lumbar spine show "mild narrowing" at L4-L5 (Tr. 418, 437). The same month, Plaintiff's supervisor, Cheri L. Stiene, composed a letter on behalf of the disability claim, stating that Plaintiff experienced "constant" back pain and required help from coworkers to perform lifting chores and take out trash (Tr. 421).

Dr. Tadeo's October, 2010 records state that Plaintiff was terminated after arguing with a supervisor, then was rehired after she told the supervisor that she was currently receiving mental health treatment (Tr. 433). Plaintiff's dosage of Tripeptal was doubled (Tr.

481).  Plaintiff reported later the same month that her symptoms had improved and that the increased dosage was "making all the difference" (Tr. 482).  The same month, a CT of the lumbar spine showed degenerative disc disease with mild foraminal narrowing at L4-5 and facet joint arthropathy at L3-4, L4-5, and L5-S1 (Tr. 438).  Therapy notes from the next month indicate that Plaintiff appeared stable (Tr. 484).  Therapy notes from later the same month state that Plaintiff was "struggling emotionally" because of financial stressors (Tr. 487).

Therapy notes from January, 2011 state that Plaintiff reported that she was sleeping "a lot more" and "drinking a lot more alcohol" (Tr. 489).  She stated that she had to "drink a small can of beer" before coming to the appointment (Tr. 489).  She reported that she had recently spent two-and-a-half weeks on the road with her boyfriend, a truck driver (Tr. 489).  Dr. Tadeo's notes state that Plaintiff was cooperative with good eye contact and fair focus (Tr. 505).  In February, 2011, treating records note Plaintiff's complaint of a chronically dislocated shoulder that "popped in and out" (Tr. 463).  She reported that the condition was worsening (Tr. 463).  She was prescribed Vicodin for as needed use (Tr. 465).  Therapy notes state that she was now smoking marijuana (in addition to drinking) as a coping mechanism (Tr. 490). She reported that she was worried about her son's upcoming court hearing (Tr. 492).  The following month, she noted that marijuana helped her sleep (Tr. 493).  She reported support from family and friends (Tr. 493).  Later the same month, she reported that she was "not as explosive" as before (Tr. 496).

-10-

In April, 2011, Plaintiff stated that she felt "overwhelmed" by both a recent verdict against her former employer and her son's legal problems (Tr. 499). Dr. Tadeo's notes state that Plaintiff exhibited "good focus" (Tr. 506). Bayside records from the following month state that Plaintiff experienced pain of the hands, shoulders, and knees (Tr. 510). She reported symptoms of sleep apnea (Tr. 510). The treating notes reference x-rays showing "AC separation and arthritis" of the shoulder (Tr. 511).

The following month, an annual therapy assessment noted that Plaintiff reported that she was "doing better" since beginning therapy the previous year (Tr. 519). Plaintiff reported stress as a result of the sexual harassment case that had recently ended as well as the criminal charges filed against her son (Tr. 519). Plaintiff opined that she did not feel capable of working due to "physical and mental limits" (Tr. 519). She was currently receiving unemployment checks from her former work as a clerk (Tr. 519). She was assigned a GAF of 40 (Tr. 520). The following month, Dr. Tadeo noted "good focus" and a logical thought process (Tr. 525). The same month, Plaintiff reported to her therapist that she had worked "hard" on her garden and wanted the therapist to see it (Tr. 526). In August, 2011, Plaintiff reported depression because her dog had seizures and also because of her son's situation (Tr. 529).

The same month, Dr. Tadeo completed a functional assessment, finding extreme limitations in dealing with the public and work stress; and marked limitations in following rules, relating to coworkers, using judgment and maintaining concentration (Tr. 532). She

-11-

found moderate limitation in following detailed instructions and extreme limitations in following complex instructions (Tr. 532). Dr. Tadeo also found extreme limitations in activities of daily living and maintaining social functioning and marked limitation in maintaining concentration (Tr. 532-533). She found that Plaintiff had experienced more than four episodes of decompensation (Tr. 533). Dr. Tadeo found that Plaintiff was capable of handling her own benefit funds (Tr. 534). Also in August, 2011, Plaintiff was diagnosed with moderate sleep apnea with a recommendation for the use of a CPAP device (Tr. 542). Treating records state that Plaintiff was prescribed Albuterol for symptoms of COPD (Tr. 550-552). September, 2011 treatment records for sleep apnea state that Plaintiff drank "three beers" shortly before beginning a sleep study (Tr. 559).

### 2. Non-Treating Records

In November, 2010, R. Scott Lazzara, M.D. performed a consultative physical examination of Plaintiff on behalf of the SSA, noting Plaintiff's report of chronic neck and back pain since being abused in 1980 by a former boyfriend (Tr. 447). Plaintiff reported that she worked 12 hours a week as a cook and lived with her 15-year-old son (Tr. 447). She noted that she used a lumbar support to drive (Tr. 447). She reported that she spent her leisure time doing crafts, playing computer games, and watching television (Tr. 447). She estimated that she could stand for up to three hours, walk for one block, and lift 20 pounds (Tr. 447). She reported that she smoked two packs of cigarettes and drank "four to five" beer" every day (Tr. 447). Dr. Lazzara noted an appropriate affect, dress, and effort (Tr.

-12-

448).  He noted tenderness at L3-L4, but the absence of muscle spasms (Tr. 448).  Plaintiff exhibited "mild difficulty" in heel and toe walking and squatting and arising (Tr. 448).  The rest of the examination was unremarkable (Tr. 445-451).

The same month, Mark Zaroff, Ph.D. performed a psychiatric evaluation of Plaintiff, noting her report of frequent angry "outbursts" lasting for up to a few hours (Tr. 452).  She reported that she had been the victim of two sexual assaults as a teenager and one as a young adult (Tr. 452).  She reported that she currently took Prozac for bipolar disorder (Tr. 452).  She denied psychiatric hospitalizations but noted that she was receiving outpatient mental health treatment (Tr. 453).  Plaintiff reported that she was working part time but her coworkers "cover[ed] for her" by doing heavy lifting (Tr. 453).  She had been arrested for attempting to bring contraband into a prison and for possession of crack cocaine (Tr. 453).  Plaintiff reported that she lived with her son and boyfriend (Tr. 454).  She had a good relationship with her boyfriend, who helped her with housework, and her adult daughter who lived nearby (Tr. 454).  She spent her leisure time playing with her dogs and birds and using the computer (Tr. 454).

Dr. Zaroff observed that Plaintiff had "good contact with reality" and a logical thought process but poor self-esteem and limited insight (Tr. 454-455).  Plaintiff stated that she was "stable" as long as she was left alone (Tr. 455).  Dr. Zaroff assigned Plaintiff a GAF of 48 and a poor prognosis, noting that Plaintiff experienced depression and continued to "self-

-13-

medicate"[6] (Tr. 456). He noted that Plaintiff was receiving mental health treatment, but appeared to have "limited opportunities" (Tr. 457). He found that she was not able to manage her benefit funds due to "the possibility of recurrent addiction" (Tr. 457). He opined that due to combined mental and physical problems, she would require "structure, support, and accommodations in order to be successful" (Tr. 457).

### 3. Records Submitted After the ALJ's December 2, 2011 Determination

On November 17, 2010, Dr. Tamez completed a Medical Needs Certificate stating that Plaintiff required medical assistance for household, laundry, and shopping activities (Tr. 567). On October 3, 2011, neurologist Mohammed M. Zaman, M.D. performed an examination of Plaintiff on behalf of her claim for benefits (Tr. 560). He noted 5/5 strength in the lower extremities, but 2/4 reflexes in the knees and ankles (Tr. 561). He noted that an October, 2010 CT of the lumbar spine showed facet joint arthropathy at L3-4, L4-5, and L5-S1 (Tr. 561). He recommended a median branch block (Tr. 561).

### C. Vocational Testimony

Dr. Hecker testified that Plaintiff's former work activity (as described) consisted of jobs as a kitchen helper, administrative clerk, baker helper, and cashier (Tr. 82-84). He found that the position of administrative clerk was semiskilled and performed at the light

---

[6]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*")(4th ed.2000).

-14-

exertional level[7] (Tr. 83).  The ALJ then posed the following question to the VE, describing

a hypothetical individual of Plaintiff's age, education, and work experience:

> [A]ssume an individual . . . [who] could perform work which is non-production paced, simple and unskilled, routine and repetitive without limits.
> Further[,] this work should not be in close proximty to coworkers, meaning the individual cannot function as a member of a team, no direct contact with the public and the work should also be low stress with only occasional changes or occasional decision making required as part of the job.  This work could be performed in the light exertional range with a sit/stand option.  That means the individual could sit or stand at will while performing the assigned duties.  This individual could stand for up to 15 minutes at a time, walk for up to 15 minutes at a time and with normal beaks for a total of two hours in an eight-hour workday.  This individual could sit in one-hour increments with normal breaks for a total of six hours in an eight-hour workday.  I'm going to reduce the pushing and pulling with the right upper extremity to occasional, I'm going to reduce the overhead reaching with the right upper extremity to occasional.
> Avoid concentrated exposure to hazards and vibrations, avoid concentrated exposure to extreme temperatures, wetness, humidity and pulmonary irritants.
> This individual can perform postural activities occasionally of climbing ramps and stairs, balancing, stooping, crouching, kneeling, crawling, no climbing of ladders, ropes and scaffolds.  This individual should be allowed to wear a back brace and also while sitting use the positional supports as described in the claimant's testimony of a soft curved shaped thing placed behind her back and something that goes around her neck[,] I think in the shape of a seat.  Also moderate noise level.  Can this hypothetical individual perform the claimant's past work? (Tr. 84-85)

---

[7]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

The VE responded that the above-limited individual would be unable to perform any of Plaintiff's past relevant work but could perform the light, unskilled work of packager (1,500 positions in the regional economy); inspector/checker (1,800); and clerical assistant (4,000) (Tr. 85-86). He testified that if the same individual were additionally limited to lifting a maximum of 15 pounds occasionally and only frequent gross and fine manipulations, the job findings would remain unchanged (Tr. 86). He stated that a "need to nap for two to three hours during the course of a workday" would preclude all work (Tr. 86-87). Likewise, he found that being off task 20 percent of the day due to impairments and medication side effects would preclude all work (Tr. 87). He concluded by stating that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations (Tr. 87).

### D. The ALJ's Decision

Citing the medical records, ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease; bipolar disorder; polysubstance abuse; chronic obstructive pulmonary disease ("COPD"); arthritis; obstructive sleep apnea; [PTSD]; and migraine headaches" but that none of the conditions met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 21). She found that Plaintiff experienced moderate impairment in activities of daily living, social functioning, and "concentration, persistence, or pace" (Tr. 22). She noted that the presence of moderate psychological limitations did not prevent Plaintiff from gardening, visiting with friends, and

interacting with others by telephone (Tr. 22).  The ALJ pointed out that Plaintiff's part-time

work terminated as a result of a fire rather than Plaintiff's psychological limitations (Tr. 22).

The ALJ noted that despite the moderate concentrational impairments, Plaintiff exhibited

"good focus, concentration, and memory" (Tr. 22).  The ALJ determined that Plaintiff had

the  Residual Functional Capacity ("RFC") for light work with the following additional

restrictions:

> [S]he can lift a maximum of 15 pounds on an occasional basis; she requires the
> option to alternate between sitting and standing at will; she can stand for up to
> 15 minutes at a time and walk for 15 minutes at a time for a total of 2 hours out
> of an 8-hour workday; she can sit for 1 hour increments for a total of 6 hours
> out of an 8-hour workday; she can perform fine and gross manipulations
> bilaterally on a frequent, as opposed to constant, basis; she can occasionally
> push and/or pull with her right upper extremity; she can occasionally reach
> overhead with her right upper extremity; she must avoid concentrated exposure
> to hazards, vibrations, temperature extremes, wetness, humidity, and
> pulmonary irritants; she can occasionally balance, stoop, crouch, kneel, crawl,
> and climb ramps or stairs, but she can never climb ladders, ropes, or scaffolds;
> she must be allowed to wear a back brace while she works and use positional
> supports when she sits; she requires a work environment with moderate noise
> levels; she is limited to non-production paced work that is simple, unskilled,
> routine, and repetitive; she should not work in close proximity to co-workers,
> meaning she could not function as a member of a team and she can have no
> direct contact with the public; and she is limited to low-stress work with only
> occasional changes or decision-making required (Tr. 23).

Citing the VE's testimony, the ALJ determined that while Plaintiff was unable to perform her

past relevant work, she could perform the work of a packager, inspector/checker, and office

clerk (Tr. 28).

The ALJ credited a portion of Plaintiff's allegations, but noted that "[a] primary

inconsistency is that the . . . allegations of pain and physical limitations are not supported by

-17-

the objective evidence of record" (Tr. 25).  She cited Dr. Lazzara's consultative observations of a normal gait and normal grip strength and dexterity (Tr. 25).  The ALJ noted that Plaintiff told Dr. Lazzara that she could stand for up to three hours and lift 20 pounds (Tr. 25).

The ALJ discounted  Dr. Tadeo's finding of marked and extreme limitations, noting that the findings were "inconsistent with the evidence of the record as a whole," including "Dr. Tadeo's own treatment notes" (Tr. 26).  The ALJ rejected Dr. Zaroff's finding that Plaintiff had a "poor" prognosis (Tr. 26, 456).  The ALJ noted that Dr. Zaroff's conclusion that Plaintiff had "limited" access to treatment stood at odds with his statement that Plaintiff was obtaining good results from treatment (Tr. 26, 454-457).  The ALJ pointed out that Plaintiff's statement to Dr. Zaroff that "she was stable as long as she is left alone by other people" was reflected in the RFC limiting her to non-teamwork positions where she was not required to interact with the public (Tr. 23, 26, 455).

## III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

-18-

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at

-19-

step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." 7 *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

Plaintiff make five arguments in favor of remand.  First, she contends that the ALJ failed to discuss all of Dr. Tadeo's findings, including the opinion that Plaintiff experienced marked and extreme work-related limitations.  *Plaintiff's Brief* at 4-5, *Docket #13.*  She argues that the ALJ also erred by failing to discuss Dr. Tadeo's June, 2010 and May, 2011 notes stating a GAF of 40.  *Id.* (citing Tr. 475-476, 519-520).  She notes that the GAF scores assigned by Dr. Tadeo are supported by Dr. Zaroff's consultative finding that Plaintiff had a GAF score of 48.  *Id.* (citing Tr. 457).  On a related note, she argues that the  ALJ's rejection of Dr. Tadeo's opinion is not supported by the record.  *Id.* at 6-14.

In her second argument, she makes an independent contention that the ALJ's rejection of Dr. Zaroff's consultative opinion is not supported by the record.  *Id.* at 14-17.   Third, Plaintiff argues that the ALJ failed to incorporate Dr. Tamez's November, 2010 Medical Needs Certificate into the transcript, despite the fact that the Certificate was submitted one year before the administrative decision was issued (Tr. 29).  Fourth, Plaintiff argues that the ALJ applied the wrong legal standard in discounting the allegations of limitation.  *Id.* at 19-24.  On a related note, she argues last that the ALJ erred by discrediting her allegation based on her ability to work part time and later, her receipt of unemployment benefits. *Id.* at 24-28.

-20-

Plaintiff's first and second arguments disputing the weight accorded to the treating psychiatrist and consultive psychologist rely on overlapping portions of the transcript and thus, can be discussed in tandem. Plaintiff's fourth and fifth arguments both pertain to the credibility determination and will be considered together. Plaintiff's argument that the ALJ erred by not incorporating Dr. Tamez's findings into the transcript will be discussed separately.

### A. The ALJ's Discussion of the Medical Evidence

### 1. Dr. Tadeo's Findings

Plaintiff argues that the ALJ erred by discounting Dr. Tadeo's August, 2011 findings of extreme and marked limitations in work-related activities, daily activities, social function, and concentration. *Plaintiff's Brief* at 6-14. She disputes the ALJ's rejection of Dr. Tadeo's assessment on the basis that it was contradicted by the treating records. Plaintiff argues that the ALJ's conclusion was based on isolated portions of the record which taken out of context, seem to support a non-disability finding. She contends that the sum of Dr. Tadeo's treating records comport with the August, 2011 finding of marked and extreme limitations.

Plaintiff is correct that the failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS,* 710 F.3d 365, 376 (6th Cir.2013); *Wilson v. CSS*, 378 F.3d 541, 544–546 (6th Cir.2004) (citing § 404.1527(c) (2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good

-21-

reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.' " *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Gayheart,* at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

The ALJ did not err in finding that Dr. Tadeo's August, 2011 findings contradicted the treating records.  The ALJ reasonably concluded that the finding that Plaintiff experienced extreme limitations in concentration stood at odds with Dr. Tadeo's observation from the previous month that Plaintiff exhibited "good focus, concentration, and memory" (Tr. 26, 525).  While the ALJ did not discuss every one of the 17 subcategories in which the Dr. Tadeo found marked or extreme limitations, the rejection of Dr. Tadeo's opinion that Plaintiff lacked the ability to function independently is well articulated and amply supported by the psychiatric records.   The ALJ also cited Dr. Tadeo's treating notes indicating that Plaintiff exhibited appropriate dress, good hygiene, good eye contact, and a cooperative attitude (Tr. 26).

Plaintiff's argument that the ALJ cherry-picked the record for isolated findings supporting the rejection of Dr. Tadeo's opinion stands at odds with my own review of the treating records showing that Plaintiff's psychological symptoms lessened as she continued to receive treatment.   In July, 2010, Dr. Tadeo found that Plaintiff had "poor" focus (Tr.

504); January, 2011, "fair" focus (Tr. 505); and July, 2011, "good" focus (Tr. 525).   The ALJ's inference that Plaintiff's psychological treatment improved steadily with medication and therapy is well supported (Tr. 25-26).  Despite Plaintiff's citation to May, 2011 records showing struggles with concentration (Tr. 519) and July, 2011 records including Plaintiff's reports of continued "impulsive behavior and anger outbursts" (Tr. 525), the treating records support the conclusion that her condition improved.  I note that none of the records would support  Dr. Tadeo's finding of extreme limitations or four episodes of decompensation. Plaintiff's ability to work until December, 2010 when a fire destroyed her place of employment also undermines Dr. Tadeo's opinion that Plaintiff had extreme occupational limitations.  While Plaintiff argues that Dr. Zaroff's consultative findings comport with Dr. Tadeo's assessment, as discussed below, the  discussion and partial rejection of Dr. Zaroff's conclusion is also well supported.  Plaintiff also faults the ALJ for failing to discuss each of Dr. Tadeo's discrete findings,  but provides no support for her contention that the ALJ was required to discuss all 18 subcategories in which Dr. Tadeo found marked or extreme limitations.  Moreover, the ALJ devoted two paragraph to discussion of Dr. Tadeo's findings and the rationale for discounting the   marked and extreme findings.

Plaintiff's additional argument that the ALJ erred by failing to accord any weight or discuss the GAF score of 40 in Dr. Tadeo's treating records is not well taken.  *Plaintiff's Brief* at 4-6.  "A GAF score is . . . not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues.  *Oliver v.*

-23-

*Commissioner of Social Sec.*, 415 Fed.Appx. 681, 684, 2011 WL 924688, *4 (6th Cir. March 17, 2011) (citing *White v. Commissioner of Social Sec.,* 572 F.3d 272, 284 (6th Cir.2009) ); See also *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002)("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place").   Thus, the ALJ did not err in omitting mention of the GAF in discussing Dr. Tadeo's records.   The omission of reference to a GAF in discussing the medical records does not constitute error.   See *Bryce v. Commissioner of Social Sec.,* 2014 WL 1328277, *9 (E.D.Mich. March 28, 2014)(Goldsmith, J.)(relying on *Howard,* 276 F.3d at 241).   "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."   While I note that Dr. Tadeo's ongoing treating records did not change her original assignment of a GAF of 40, the ALJ corrrectly noted that the treating notes supported the finding that Plaintiff's condition continued to improve.

### 2.  Dr. Zaroff's Consultative Findings

`       I also disagree with Plaintiff's contention that the ALJ erred by partially discounting Dr. Zaroff's November, 2010 consultative findings.  *Plaintiff's Brief* at 14-17.

In discounting the consultative examiner's findings, the ALJ noted that  Dr. Zaroff's comment that Plaintiff had "limited opportunities," stood at odds with the fact that Plaintiff had been receiving mental health care for several months at the time of the November, 2010 examination (Tr. 26).  Plaintiff argues that Dr. Zaroff's "limited opportunities" comment did not refer to her inability to obtain proper mental health treatment, but rather, her condition as

-24-

a whole. *Plaintiff's Brief* at 15. The "limited opportunities" remark, in context, states that Plaintiff "is receiving mental health treatment at this time, but she seems to have limited opportunities, as well [as] she is coping with some significant physical difficulties limiting her" (Tr. 457). The ALJ's inference that Dr. Zaroff found "limited access to mental health care" is a reasonable interpretation of the statement (Tr. 26). While Dr. Zaroff noted Plaintiff's report that she was receiving therapy, his examination notes do not indicate that he had access to her treating records.

Plaintiff also faults the ALJ for citing her statement that she was "stable as long as everybody is leaving me alone" on the basis that it understated the seriousness of the psychological limitations. *Plaintiff's Brief* at 15-16 (citing Tr. 26, 455, 457). Plaintiff disputes the ALJ's finding that the preclusion on direct contact with the public and restrictions on working in groups found in the RFC adequately reflected her social limitations (Tr. 26). She argues that her statement to Dr. Zaroff supports the conclusion that she was required to live in isolation. *Plaintiff's Brief* at 15.

 The ALJ's interpretation of Plaintiff's statement that she was stable when left alone is supported by the record as a whole.  The therapy records indicate that over the course of Plaintiff's treatment,  a significant portion of her anxiety was created by situational stressors, such as court proceedings against her former employer for sexual harassment and an unrelated case against Plaintiff's underage son for criminal sexual conduct.  Given Plaintiff's testimony that she enjoyed a long-term romantic relationship and interacted with at least one friend on

a regular basis, her statement that she was stable when "left alone" would be more reasonably interpreted to state that her anxiety and depression were exacerbated in large part by the problems of those around her, rather than that she needed to live in total isolation.

Likewise, the ALJ did not err in finding that the GAF of 48 assigned by Dr. Zaroff stood at odds with his finding that the depression was "moderate" (Tr. 27, 456). While Plaintiff argues that the GAF assigned by Dr. Zaroff was also based on her physical problems, the ALJ correctly noted that the alleged degree of physical limitation in the administrative transcript was not strongly supported by the imaging studies and clinical evidence (Tr. 25). The inference that the GAF score assigned by Dr. Zaroff was colored by Plaintiff's somewhat exaggerated account of her physical limitations is not unreasonable. Finally, I note that because Dr. Zaroff was an examining rather than treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994) (citing *Atterberry v. Secretary of Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir.1989)). For these reasons, the ALJ did not err in giving limited weight to Dr. Zaroff's opinion.

### B. The Credibility Determination

Plaintiff argues next that the ALJ determination that her claims of limitation were not wholly credible was not supported by substantial evidence. *Plaintiff's Brief* at 19-24. On a related note, she contends that the ALJ erred by citing her ability to work part time and her receipt of unemployment benefits to discount the disability claim. *Id.* at 24-28.

-26-

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2. The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."*Id.* [8]

The ALJ's credibility determination is well supported and explained. First, the ALJ noted that she *adopted* a significant portion of the alleged limitations by restricting Plaintiff to 15 pounds lifting, sitting for more than an hour at a time, the need for a back brace, postural limitations, and environmental limitations due to COPD (Tr. 23, 25, 45, 49-50, 52). The ALJ's rejection of Plaintiff's more extreme claims of limitation are similarly well

---

[8]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

 (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

supported.  The ALJ cited Dr. Lazzara's observation of a normal gait, full ranges of motion in all joints except for mild limitations of the lumbar spine, good grip strength, and the absence of knee problems (Tr. 25, 445-451).  While Plaintiff argues that the finding that she could sit for up to one hour at a time is unsupported by the medical record, she fails to note that it is supported by her own testimony (Tr. 60).  Moreover, the ALJ credited her testimony that she required "positional supports" while seated by placing the restriction in the RFC and allowing her to change positions at will (Tr. 23, 60).

Plaintiff also argues that the ALJ erred by citing her ability to work part time in support of the non-disability decision.  However, the ALJ's determination cannot be read to state that the former work activity, by itself, was irrefutable proof of non-disability.  Instead, the ALJ noted that Plaintiff's claim that she lacked the physical and psychological ability to perform substantial gainful employment was undermined, along with other factors, by her ability to hold a part-time job.  The ALJ also noted that the job had not been terminated by due to Plaintiff's alleged limitations, but rather, because the place of employment had been destroyed by fire (Tr. 25).

Finally, I disagree that the ALJ erred by citing Plaintiff's  receipt of unemployment benefits in discounting the disability claim (Tr. 25).  This Circuit has found that the collecting of unemployment benefits (requiring recipients to state that they are seeking work) stands at odds with allegations of disability under the Social Security Act.  *Workman v. Commissioner of Social Sec.*, 105 Fed.Appx. 794, 801, 2004 WL 1745782, *7 (6th Cir. July 29, 2004) (citing

-28-

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983)(upholding an ALJ's credibility determination on the basis that "[a]pplications for unemployment and disability benefits are inherently inconsistent"). See also *Bowden v. Commissioner Social Sec.*, 1999 WL 98378, *7 (6th Cir. January 29, 1999) (the claimant "offers no reasonable explanation of how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that she is ready and willing to work").

Plaintiff cites a memorandum by Chief ALJ Frank A. Cristaudo which states that "[i]t is the SSA's position that individuals need not choose between applying for unemployment insurance and Social Security disability benefits." *Plaintiff's Brief* at 24-25. However, the memorandum goes on to note that "the underlying circumstances will be of greater relevance than the mere application for and receipt of the benefits." Applicably here, the ALJ did not base the credibility determination solely on the receipt of unemployment benefits, but noted that other factors, including Dr. Lazarra's findings, Plaintiff's statements to Dr. Lazarra, her ability to work part time, and daily activities, *combined* with the receipt of unemployment benefits stood at odds with the disability claim. As such, the deference generally accorded an ALJ's credibility determination is appropriate here. "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' " *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir.2007) (citing *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997)). See also *Casey v. Secretary of Health and Human Services*, 987

F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989) (citing *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

### C.  The Medical Needs Certification

Plaintiff argues next that a Medical Needs Certificate by Dr. Tamez included in the evidence submitted to the Appeals Council had already been submitted for review by the ALJ on December 1, 2010.  *Plaintiff's Brief* at 18-19 (citing Tr. 565-567).  Plaintiff contends that the ALJ's failure to review Dr. Tamez's November, 2010 opinion constitutes grounds for remand.  *Id.*

However, for reasons that appear to be no fault of the Plaintiff, the Certificate was omitted from the administrative record considered by the ALJ.  Plaintiff resubmitted the Certificate to the Appeals Council. Because the administrative transcript was closed as of the ALJ's decision, the district court cannot consider the subsequently offered evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton v. Sullivan*, 2 F.3d 692, 696–696 (6th Cir.1993). Sentence six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." (emphasis added). Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of § 405(g).

-30-

Plaintiff has shown "good cause" for the submission of the new material after the administrative decision.  Along with the Medical Needs Certificate, she has provided correspondence showing that she in fact first submitted this evidence for review by the ALJ over one year before the December 2, 2011 administrative decision (Tr. 566). Through no fault of her own, the Certificate did not find its way into the material that the ALJ considered.

The Plaintiff had also shown that this evidence would be "material" to the administrative determination. To show that the newer evidence is material, Plaintiff "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" See *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 711 (6th Cir.1988).  The Certificate completed by Dr. Tamez states that Plaintiff requires assistance in completing shopping, laundry, and household chores as a result of back problems (Tr. 567).  Placed in the context of the record, there is a reasonable probability exists that the new evidence would change the ALJ's determination.  As discussed above, the ALJ's rejection of  Drs. Tadeo and Zaroff's opinions are well developed and supported, and based on the transcript at the time of the decision, the ALJ did not err in relying on Dr. Lazarra's findings regarding the physical restrictions.  However, I note that the November, 2010 Certificate stating that Plaintiff was unable to perform even household chores independently undermines Dr. Lazarra's findings of fairly insignificant limitations (Tr. 445-451).   In addition,  Plaintiff testified that she received state-based assistance with housework and shopping chores (Tr. 64-64).

-31-

Placed in the context of the existing record, a remand for consideration of the new evidence is appropriate.  First, the Certificate constitutes medical evidence supporting the finding that Plaintiff required assistance with household chores.   Second, based on the new evidence, I cannot speculate on whether the ALJ would decline to change her previous findings, modify her findings, or determine that the new material "tipped the balance" in favor of a disability determination.  Third, remand for the purpose of considering the November, 2010 Certificate is particularly appropriate, given that its omission from the original transcript appears to be the Commissioner's fault.

## VI.   CONCLUSION

For the reasons set forth in Section C. of the analysis, I recommend that the case be remanded under the sixth sentence of 42 U.S.C. 405(g) for further  consistent with Section V-C. of the analysis, with this Court retaining jurisdiction

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v.*

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing

party may file a response. The response shall be not more than 20 pages in length unless by

motion and order such page limit is extended by the court. The response shall

address specifically, and in the same order raised, each issue contained within the objections.


                                   s/R. Steven Whalen
                                   R. STEVEN WHALEN
                                   UNITED STATES MAGISTRATE JUDGE
Dated: August 27, 2014


                           <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record
on August 27, 2014, electronically and/or by U.S. mail.

                                   s/Carolyn M. Ciesla
                                   Case Manager to the
                                   Honorable R. Steven Whalen